Thomas F. KELLY, Sr., Thomas F. Kelly, Jr., and George L. Kelly, co-partners, doing business under the name and style of Illinois Sports News, Plaintiffs,

v.

ILLINOIS BELL TELEPHONE COMPANY, an Illinois corporation, The Western Union Telegraph Company, a New York corporation, Defendants,

and

United States of America, Defendant-Intervenor.

Civ. A. Nos. 62 C 955, 62 C 932.

United States District Court
N. D. Illinois, E. D.
Oct. 23, 1962.

Edward J. Calihan, Jr., Chicago, Ill., and Walter E. Gallagher, Washington, D. C., for plaintiffs.

Roy W. Sears, Eckhart, Klein, McSwain & Campbell, Chicago, Ill., for Western Union Telegraph Co.

James P. O'Brien, U. S. Atty., for defendant-intervenor.

Walter Cummings, Jr., Sidley, Austin, Burgess & Smith, Chicago, Ill., for Illinois Bell Telephone Co.

WILL, District Judge.

The Court, having examined the pleadings, the Stipulations of Facts, and the documents admitted as evidence in this case, and having heard the arguments of and examined the briefs filed by counsel, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Thomas F. Kelly, Sr., Thomas F. Kelly, Jr. and George L. Kelly are residents of the State of Illinois and are co-partners in and sole owners of the business known as "ILLINOIS SPORTS NEWS" (hereinafter referred to as "Illinois"). Their principal office is located at 906–08 South Wabash Avenue, Chicago, Illinois.

2. Illinois publishes the publication known as "Illinois Sports News", various editions of which are printed daily, except Sunday, in the English language, and circulated and displayed for sale to the public generally throughout the midwest and as far south as Florida and Louisiana. The publication is printed on a semi-stiff sheet of hard paper approximately 12½ by 19 inches in overall dimensions, and double folded so as to make eight pages each approximately 6¼ by 9½ inches.

3. The information contained in the different editions varies considerably.

Some editions printed for use at a particular race track contain information only with respect to the races being run at that track on the date of publication (See Court exhibit No. 1). Other editions contain information with respect to races being run at various tracks throughout the country as well as short news items with respect to matters of interest in sports other than horse racing, such as golf, baseball, boxing, etc. (See Court exhibit No. 2.)

4. Illinois, which has a bona fide list of actual prepaid subscribers, has been published regularly since 1947 at the same address, under the same name and style.

5. Illinois has continuously utilized the facilities of the defendant Illinois Bell Telephone Company, an Illinois corporation (hereinafter referred to as "Telephone Company"), and The Western Union Telegraph Company, a New York corporation (hereinafter referred to as "Western Union") as well as the facilities of the UNITED PRESS INTERNATIONAL (hereinafter referred to as "United") since the following dates:

| Telephone Company | 1947 |
| Western Union | 1951 |
| United | 1947 |

In addition, Illinois has had and used second class mail privileges granted by the United States Post Office Department since 1947.

6. Certain of the employees of Illinois, including linotypers and drivers, are members of various unions and Illinois has contracts with such unions.

7. Since 1947 Illinois has used the facilities provided it by the Telephone Company in carrying out its everyday business and, in addition, receives by telephone each morning, except Sundays, certain information concerning horse racing, more particularly described as follows:

(a) "Scratches" means the names of horses which have been withdrawn from the horse racing events in which they had been entered to compete.

(b) "Jockeys and Weights" means the names of the jockeys who will ride specified horses in that day's racing events and the weights of said jockeys.

(c) "Track Condition", meaning whether or not the track is wet, fast, muddy, or slow.

(d) "Program Selections", the selections by the track handicapper, which appear in the official printed program, constituting the truck handicapper's estimate of the winner, place (second) and show (third) horses as they will finish in each particular racing event.

(e) "Post Position of Horses", meaning the relative position from the inside to the outside of the track in which the horses will start the race.

8. The foregoing information, after receipt, is studied by so-called handicappers employed by Illinois at its place of business, who prepare their own estimates of the respective abilities of each of the horses entered in the various racing events, and their own estimates of the possibilities of each horse winning in the event in which he is entered. The information received by telephone, as previously set forth, together with the handicappers' estimates or forecasts of what the wagering through the parimutuel machines at the track is likely to be, which is called the "morning line", as well as the handicappers' own selection or estimate of the order in which the horses will finish in each event, is published in certain of the editions of the Illinois Sports News. In addition, certain information concerning the past performances of the various horses is published in the same editions.

9. With the exception of the "morning line" and "past performance" information, all of the foregoing is also transmitted by telephone each morning, except Sundays, to the Detroit Sports News of Detroit, Michigan, Harvey A. Junior of Miami, Florida, and The Toronto. Daily Sports News of Toronto, Ontario, Canada.

Each of these publications contains horse racing information and they have been published for 19, 32 and 28 years respectively.

10. In addition, the telephone facilities are also used to obtain information from race tracks in the Chicago, Illinois; Detroit, Michigan; New Orleans, Louisiana; and Hot Springs, Arkansas areas when such tracks are running. The information received from the tracks in question consists of the names of the horses entered and their anticipated jockeys for the following day's races.

11. For many years Illinois has used the facilities of Western Union each day, except Sunday, for the transmission of racing information and other information of a general character to Chicago's American of Chicago, Illinois formerly the Chicago Herald-American, the Chicago Turf Bulletin of Chicago, Illinois, The Pierce News Company of St. Louis, Missouri, and, prior to July 20, 1962, a business owned by plaintiffs as co-partners and known as the Louisville Daily Sports News (hereinafter referred to as "Louisville"). Each of the foregoing publishes publications containing horse racing information and information of a general character.

12. Illinois uses the facilities of United for the receipt of information of a public and sporting character. Some of such information is published by Illinois in its publications and some is transmitted by Western Union teleprinter facilities as hereinbefore set forth.

13. Neither Illinois nor Louisville have, since September 13, 1961, furnished any information, other than by means of their publications, to any person or business except as set forth in paragraphs 9 and 11 hereof.

14. Neither plaintiffs nor their employees accept bets or wagers either by telephone or telegraph or otherwise.

15. The various editions of Illinois' publications may generally be described as follows:

(a) *Harness Track Edition*—sold in Chicago at newsstands and at the harness track when harness racing events are being held in the Chicago area containing entries, morning line, post position, handicap order, jockeys, weights and past performances. This publication is published and available for purchase at approximately 3 P.M. on racing days.

(b) *Early "Overnight" Edition*—sold in Chicago at newsstands, in the local tracks and out of town and in other states to news distributors, containing entries, overnight line, handicap order, jockeys, weights, past performances, post position, and information of a general nature, and is published and available for purchase after 3:30 P.M. daily, except Sundays.

(c) *Late "Overnight" Edition*—sold out of town, and in other states, to newsdealers and newsstands, except on Saturday night, when part of this edition is sold in Chicago, containing entries, overnight line, handicap order, jockeys weights, past performances, post position, results and information of a general nature, and is published and available for purchase after 6 P.M. daily, except Sundays.

(d) *Latest Turf Edition*—sold in Chicago at newsstands and within 40 miles thereof and to news distributors in nearby states, containing entries, jockeys, post position, weights, morning line, scratches, past performances, results and information of a general nature, and is published and available for purchase after 9 P.M. daily, except Sundays.

(e) *Race Track Edition*—sold at newsstands in the Chicago area and in the local tracks and containing entries, jockeys, weights, morning line, post position, scratches, past performances and results of horses entered in events at the local tracks and is published and available for purchase after 10 A.M. daily, except Sundays.

(f) *Weekly Edition*—published once weekly, giving "selections" of outstanding horses entered at various race tracks which might participate in racing events scheduled for the succeeding week.

16. The last edition published by Illinois for a particular day's racing events is printed, published and distributed before 10:30 A.M. of that day and the first edition for the following day's racing events is printed, published and distributed after 3:30 P.M. Prior to July 20, 1962, Louisville printed, published and distributed only one edition daily, except Sundays, which was distributed before 10:00 A.M. The Louisville office then closed until the following morning at about 6 A.M. Since July 20, 1962, Louisville has suspended publication.

17. Illinois has a total daily net paid circulation which varies from a low of approximately 6,725 copies per day in December to a high of approximately 29,-000 copies per day in August when horse racing meetings are being held in Chicago, Illinois. The daily average net circulation is approximately 17,000 copies per day. During the low month of December, the total of 6,725 copies sold daily is made up of approximately 4,300 Latest Turf Editions, 2,300 Overnight Editions, and 125 Weekly Editions, all as hereinbefore described. During the month of August the total of approximately 29,000 copies sold daily is made up of approximately 2,850 Harness Track Editions, 2740 Early Overnight Editions, 1,500 Late Overnight Editions, 17,260 Latest Turf Editions, 4,618 Race Track Editions and 125 Weekly Editions. Louisville had a total daily net paid circulation which varied from a low of approximately 1,000 copies per day during December to a high of approximately 2,500 copies per day during May when Churchill Downs conducts a horse race meeting in the vicinity of Louisville, Kentucky, the average daily sales and distribution being approximately 1,729 copies.

18. Illinois advertises in all editions of its publications of the Illinois Sports News, except its race track and harness editions, without charge, that racing information can be obtained by calling Chicago telephone number Webster 9–1900, a facility leased by Telephone News System, Inc. from the Telephone Company, and Illinois pays Telephone News System, Inc., $600.00 weekly for advertising Illinois by spot announcements on the telephone service maintained by Telephone News System, Inc.

19. Information pertaining to the same races as are carried in the publications of Illinois is reported in varying degrees in newspapers of general circulation in the City of Chicago including The Chicago American, The Chicago Tribune, The Chicago Sun-Times, and The Chicago Daily News. The "Racing Special" edition of Chicago's American carries substantially similar information with respect to races at various race tracks around the country as is carried in the "Lastest Turf Edition" of the Illinois Sports News (see Court's exhibits 2 and 3).

20. The general regulations of the Illinois Bell Telephone Company applicable to general local exchange tariffs provide in part as follows:

"USE OF SERVICE FOR UNLAWFUL PURPOSES—The service is furnished subject to the condition that it shall not be used for the purpose of making or accepting bets, furnishing information, or for any other purposes in connection with any gambling scheme, business or device, or for any similar unlawful purpose. Any subscriber whose service is to be discontinued or any applicant to whom service is to be denied under this regulation will be notified by the Telephone Company of his right to a hearing by the Illinois Commerce Commission to determine whether or not such service is being used or will be used in violation of this rule. Upon complaint to the Commission by any applicant or subscriber who is affected by the refusal or discontinuance of service in accordance with this rule, such serv-

ice will be provided, continued or restored if the Commission shall determine that the service has not been used or is not intended to be used in violation of this rule."

21. The general regulations of the American Telephone and Telegraph Company applicable to message toll telephone service provide, in part, as follows:

"USE OF SERVICE FOR UNLAWFUL PURPOSES—The service is furnished subject to the condition that it will not be used for an unlawful purpose."

22. The facilities of the Telephone Company and Western Union are indispensable to the operations of the plaintiffs' business, which grosses in excess of $10,000 per week, and the discontinuance of the services of the Telephone Company and Western Union to Illinois would force plaintiffs out of business.

23. Under date of April 25, 1962, the United States Department of Justice, over the signature of Herbert J. Miller, Jr., Assistant Attorney General, wrote to the Telephone Company as follows:

"Mr. Floyd Brown
"Security Department
"Illinois Bell Telephone Company
"212 West Washington Street
"Chicago 6, Illinois
"Dear Mr. Brown:

"Information in the files of the Department of Justice reveals that the telephone facilities located at the following place are being and will be used for the transmission and receiving of gambling information in interstate commerce in violation of Federal law:

"Illinois Sports News
"906–08 South Wabash Avenue
"Chicago 5, Illinois
"(WEbster 9–5900)

"Pursuant to the provisions of subsection (d) of Section 1084 of Title 18, United States Code, you are therefore required to discontinue the leasing of said facilities, after reasonable notice to the subscriber.

"In my judgment five days notice constitutes reasonable notice under the circumstances."

24. Under date of April 27, 1962, the Telephone Company, over the signature of F. H. Brown, Chief Special Agent, wrote to Illinois as follows:

"Illinois Sports News
"906–08 South Wabash Avenue
"Chicago 5, Illinois
"Gentlemen:

"We have received letters from the United States Department of Justice, acting under Title 18 of the U. S. Code, Section 1084(d), requiring us to discontinue service on the telephone and teletype facilities furnished to you at 906–08 South Wabash Avenue, Chicago, Illinois, after reasonable notice to you.

"It is our present intention to comply with this letter at 9 A.M., C.D.T. on May 5, 1962."

25. Under date of April 25, 1962, the United States Department of Justice, over the signature of Herbert J. Miller, Jr., Assistant Attorney General, wrote Western Union as follows:

"Mr. C. T. Baumgart
"District Manager
"Western Union Company
"427 South La Salle Street
"Chicago 5, Illinois
"Dear Mr. Baumgart:

"Information in the files of the Department of Justice reveals that the Western Union Sports Ticker, located at the following place is being and will be used for the transmission and receiving of gambling information in interstate commerce in violation of Federal law:

"Illinois Sports News
"906–08 South Wabash Avenue
"Chicago 5, Illinois

"Pursuant to the provisions of subsection (d) of Section 1084 of Title 18, United States Code, you are therefore required to discontinue the leasing of said facilities, after reasonable notice to the subscribers.

"In my judgment five days notice constitutes reasonable notice under the circumstances."

26. Under date of April 30, 1962, the Department of Justice, over the signature of Herbert J. Miller, Jr., Assistant Attorney General, wrote Western Union as follows:

"Mr. C. T. Baumgart
"District Manager
"Western Union Company
"427 South La Salle Street
"Chicago 5, Illinois

"Dear Mr. Baumgart:

"Reference is made to our letter to you of April 25, 1962 with reference to the Western Union Service provided to the Illinois Sports News. As we indicated, the equipment leased by you is being used for the transmission of gambling information in interstate commerce in violation of Federal law and, under the provisions of Section 1084(d), Title 18, United States Code, you are required to remove the service. It has been called to our attention, however, that in the above-mentioned letter, we referred to the equipment in question as a Western Union Sports Ticker, and that no such equipment is in service at Illinois Sports News. Actually, the equipment is a Western Union teletype, over which Illinois Sports News transmits gambling information originating in its offices. It is to that equipment that we intend to apply the provisions of Section 1084(d).

"As we indicated in our original letter, we feel that five days' notice to the subscriber constitutes reasonable notice in this matter."

27. Under date of May 2, 1962, Western Union, over the signature of C. T. Baumgart, District Manager, wrote to Illinois as follows:

"Illinois Sports News
"906 South Wabash Avenue
"Chicago, Illinois

"Gentlemen:

"This refers to the leased wire service which is provided by The Western Union Telegraph Co. to your company with the following connections:

"Illinois Sports News, 906 S. Wabash Avenue Chicago, Illinois
"Bulletin-Record Publishing Co., 608 S. Dearborn, Chicago, Illinois
"Chicago Herald American, Sports Department, Editorial Room, 5th Floor, Tribune Building, Chicago, Illinois
"Concensus Printing Co., 7405 Page Street, St. Louis, Missouri
"Louisville Daily Sports News, 325 Breckenridge Avenue, Louisville, Kentucky

"I have today received a letter from the United States Department of Justice which indicates that the equipment leased to you by Western Union is being used for the transmission of gambling information in interstate commerce in violation of Federal law and, under the provisions of Section 1084(d), Title 18, United States Code, we are required to remove the service as detailed above.

"Please accept this as notice, therefore, that the service we are providing will be discontinued at 7 P.M. on Tuesday, May 8, 1962.

"Our equipment will be removed thereafter as soon as practicable."

### Conclusions of Law

1. Plaintiffs' activities do not violate the provisions of Illinois Revised Statutes, Chapter 38, Section 28–1(a) (10).

2. Plaintiffs' activities do not violate the provisions of Section 1084(a), Title 18 U.S.C.

3. Plaintiffs' activities are within the exception to the prohibitions of Section 1084(a), Title 18 U.S.C., contained in Section 1084(b), Title 18 U.S.C.

4. Plaintiffs' conviction in the United States District Court for the Western District of Kentucky for violation of Section 1953, Title 18 U.S.C. does not establish that the plaintiff's use of telephone and telegraph facilities is within the ambit of Section 1084(d), Title 18 U.S.C.

5. Plaintiffs are entitled to a permanent injunction restraining defendants Illinois Bell Telephone Company and The

Western Union Telegraph Company from terminating their services to plaintiffs.

## Opinion

Plaintiffs seek an injunction permanently restraining defendants Telephone Company and Western Union from discontinuing, disconnecting or otherwise terminating the telephone and telegraph facilities heretofore furnished by such defendants to plaintiffs. Upon petition of the plaintiffs and with consent of the defendants and the defendant-intervenor, United States of America, the Court has heretofore entered a temporary restraining order pending determination of the plaintiffs' prayer for a permanent injunction.

In support of their request for a permanent injunction, plaintiffs make two principal contentions:

1. That their activities do not violate any Federal, State or local law and that therefore the provisions of Title 18 U.S.C. § 1084(d) are inapplicable to them; or

2. That, if it be determined that the provisions of such section are applicable to them, the section in question is invalid in that it is contrary to the First and Fifth Amendments to the Constitution of the United States.

The government, as defendant-intervenor, on the other hand, contends:

1. That the activities of the plaintiffs do violate certain Federal and State laws, to wit—

(a) Chapt. 38, Illinois Revised Statutes, Section 28–1(a) (10);

(b) Title 18 U.S.C. § 1084(a);

(c) Title 18 U.S.C. § 1952;

(d) Title 18 U.S.C. § 1953; and

(e) Title 47 U.S.C. § 501.

2. That the provisions of Section 1084(d) in their application to the plaintiffs are valid and not in violation of either the First or Fifth Amendments to the Constitution of the United States.

Defendants Telephone Company and Western Union take no position with respect to whether on not the activities of plaintiffs violate any Federal, State or local law but assert simply that if it be found that they do, the procedures established by Section 1084(d) of Title 18 do not violate constitutional due process. That section, under which the Department of Justice demanded of the defendants Telephone Company and Western Union that they terminate the services being rendered to plaintiffs and pursuant to which such defendants notified plaintiffs of their intention to discontinue such services, reads as follows:

"(d) When any common carrier, subject to the jurisdiction of the Federal Communications Commission, is notified in writing by a Federal, State or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving gambling information in interstate or foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber, but no damages, penalty, or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency. Nothing in this section shall be deemed to prejudice the right of any person affected thereby to secure an appropriate determination, as otherwise provided by law, in a Federal court or in a State or local tribunal or agency, that such facility should not be discontinued or removed, or should be restored."

It is apparent from the foregoing that the penalty of discontinuance of facilities provided by the section is applicable only if it be found that the facility is being used "for the purpose of transmitting or receiving gambling information in interstate or foreign commerce in violation of Federal, State or local law". While the instant action is a civil proceeding in that plaintiffs seek an injunction, it is

perfectly apparent that Section 1084(d) imposes penalties for the violation of law and is in this respect quasi-criminal in nature. Moreover, although the plaintiffs here seek an injunction, the real moving party in this proceeding is the United States government which, by virtue of the letters of the Department of Justice, stimulated this action.

■ Under these circumstances, the burden of proof rests with the defendants and the defendant-intervenor, Fay v. Miller, D.C.Cir.1950, 87 U.S.App.D.C. 168, 183 F.2d 986; Andrews v. Chesapeake & Potomac Telephone Co., D.C.D.C. 1949, 83 F.Supp. 966; Hocker v. O'Klock, 16 Ill.2d 414, 158 N.E.2d 7 (1959), although it is also clear from the cases just cited that the standard of proof is that of a civil action, namely a preponderance of the evidence.

The first question then is whether the record before this Court establishes by a preponderance of the evidence that the plaintiffs are using telephone or telegraph facilities to transmit or receive gambling information in interstate or foreign commerce in violation of some Federal, State or local law so that the sanctions of Section 1084(d) of Title 18 may properly be applied to them.

It is necessary, therefore, to examine the various Federal and State statutes which the government contends are being or have been violated by plaintiffs.

The first such statute is Section 28–1 (a) (10) of the Illinois Criminal Code of 1961. This provision, which became effective January 1, 1962, provides that a person commits illegal gambling when he—

"Knowingly transmits information as to wagers, betting odds, or changes in betting odds by telephone, telegraph, radio, semaphore or similar means; or knowingly installs or maintains equipment for the transmission or receipt of such information."

It is the government's contention that the transmission by telephone or telegraph to publishers of newspapers or other publications, such as those published by plaintiffs, of the various types of information with respect to horse races set forth in the Findings of Fact, constitutes a violation of the section in question. The plaintiffs contend that a proper interpretation of the statute would limit its application to transmission of information to bookmakers outside of race track enclosures with respect to activity taking place within such enclosures.

While documentation as to the intentions of the Illinois legislature in enacting the section in question is sparse, the following statement of the Joint Committee, which drafted the revised Illinois Criminal Code, is helpful:

"Subsection (a) (10) makes it an offense to knowingly transmit betting information over the telephone or other means of rapid communication. This is designed to reach middlemen, agents and other participants in the gambling racket who might not technically qualify as offenders under other subsections of the article. It also reaches into the heart of syndicate activity by outlawing the operation of telephone networks necessary to furnish betting information." Tentative Final Draft of the Proposed Illinois Criminal Code of 1961, Committee Comments pp. 307–308.

It is to be noted that the explanation lays stress on "means of rapid communication". Similarly, the statute refers to "telephone, telegraph, radio, semaphore or similar means" again indicating that it was the intention of the legislature to make it illegal to engage in the rapid transmission of information as to wagers, betting odds or changes in betting odds.

While plaintiffs utilize such means of rapid communication in the transmission of information, it is perfectly clear that they do not furnish such information by telephone or telegraph to persons who utilize it in the making or receiving of bets but simply furnish it to

publishers of printed publications who incorporate it in their publications.

■ In the Court's opinion, the government is correct in contending that the statute is not limited to the transmission of information from within racing enclosures to the outside, but is incorrect in asserting that it applies to any utilization of telephone, telegraph or other facilities for the transmission of such information without regard to the identity of the persons transmitting or receiving such information.

The section in question is a definition of "gambling". Any reasonable construction, therefore, requires the conclusion that it is limited to the transmission by telephone, telegraph, etc, of such information to persons having some direct or indirect relation to gambling activities. In this connection, it should be noted that nowhere in the record before the Court is there any evidence that either the transmission of information by plaintiffs or their publications are directly or indirectly related to gambling activities.

If the government's interpretation is to be accepted, every transmission or the maintenance of any equipment for the transmission or receipt of information as to wagers, betting odds or changes in betting odds on any sporting event, election, etc. by any of the established news services such as the Associated Press, United Press International, as well as by newspapers of general circulation, would be in violation of the section in question since there is no provision exculpating them from its application. That the Illinois legislature intended such a substantial expansion of the concept of "gambling" is certainly not apparent from the language of the section or its legislative history.

■ Moreover, such an interpretation would require a determination that the statute in question is unconstitutional as in violation of the First Amendment to the Constitution of the United States. It is well established that a statute should be construed, if possible, so as to render it valid and constitutional rather than

invalid and unconstitutional. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1936); United States v. Five Gambling Devices, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953).

Section 28–1(a) (10) is obviously directed at the rapid transmission of either actual wagers, betting odds or changes in betting odds to or by persons directly or indirectly engaged in gambling operations. Neither the language of the statute nor the available legislative history indicates any intention to include transmissions of information to and for subsequent use by publishers of newspapers and other printed publications. Accordingly, plaintiffs' activities do not constitute "gambling" under Section 28–1 (a) (10) of the Illinois Criminal Code.

■ The first Federal statute alleged to be violated by plaintiffs is Section 1084 (a) of Title 18 United States Code, which reads as follows:

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

It is the government's contention (page 7 of its Supplemental Memorandum) that the "dissemination of racing information by Illinois Sports News * * * constitutes an illegal transmission of 'information assisting in the placing of bets or wagers on any sporting event or contest' within the meaning of Section 1084 (a) and therefore justifies the removal of such service under Section 1084(d)."

The plaintiffs deny the applicability of the section in question, asserting that by

its terms it is limited to persons "being engaged in the business of betting or wagering" and that they do not fall within that category. In answer to this contention, the government points out that the legislative history of the section indicates clearly that Congress declined to use the more restricted phrase "business of accepting wagers" which is contained in the so-called Wagering Tax Act, 26 U.S.C. 4401(c), and it must therefore be concluded that it was the Congressional intent to include within the provisions of Section 1084(a) persons other than "bookies" who actually accept bets or wagers.

Examination of the language of the section as well as its legislative history indicates beyond any doubt that Congress did intend to reach the activities of persons other than those directly accepting bets or wagers. There is considerable testimony in the hearings with respect to the complex nature of interstate gambling on sporting events, particularly horse races, and the variety of activities involved over and above the mere receipt of bets from individuals.

Recognizing that it was the intention of Congress to reach the activities of persons "engaged in the business of betting or wagering" other than "bookies" who receive bets directly from individuals, it nevertheless seems clear that the section in question does not include plaintiffs.

It has been stipulated by the parties and a Finding of Fact has been made that none of the plaintiffs or their employees engage in the receipt of bets or wagers. Nor is there any evidence before the Court that those to whom plaintiffs transmit information by use of any wire facility are so engaged.

■ It is well settled that words in a statute shall be given their normal and ordinary meaning. Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560, 52 S. Ct. 211, 76 L.Ed. 484 (1932). United States v. Stewart, 311 U.S. 60, 63, 61 S.Ct. 102, 85 L.Ed. 40 (1940), rehear-

ing denied, 311 U.S. 729, 61 S.Ct. 390, 85 L.Ed. 475 (1940). The government's contention that Section 1084(a) encompasses anybody who transmits "information assisting in the placing of bets or wagers on any sporting event or contest," is inconsistent with the language of the section itself. Had Congress intended such an interpretation, the limiting phrase "being engaged in the business of betting or wagering" would have been omitted and the statute would read simply, "Whoever * * * knowingly uses a wire communication facility for the transmission, etc."

Giving effect to all of the language actually used by Congress, it must be concluded that the prohibitions of Section 1084(a) are applicable only to persons who, in the normal context of the words, can be said to be "engaged in the business of betting or wagering". On the record before this Court, it is clear that plaintiffs are not so engaged.

In this connection, it is interesting to note that at least one committee of Congress has doubts as to whether even so-called wire services which do transmit instantaneous information for use by professional gamblers are subject to the provisions of Section 1084(a). In the Report of the Subcommittee on Investigations of the United States Senate Committee on Government Operations, issued March 28, 1962, (87th Congress, 2nd Session, Senate Report No. 1310), an Amendment to Section 1084(a) is recommended because (Page 46)—

"There is a distinct possibility that many of the wire services which were the subject of the subcommittee's investigation do not fall within the provision of this statute since they are not in fact 'engaged in the business of betting or wagering.'"

The report in question also makes it explicit that in referring to "wire services" the committee does not include legitimate news reporting agencies such as the Associated Press or United Press International. At Page 3 thereof the report states—

"The term 'wire service', in its usual sense, refers to legitimate agencies such as Associated Press and United Press International which gather news and disseminate it to daily newspapers and radio and television stations via teletype machines.

"In the context of the subcommittee's investigation the term took on an entirely different meaning. To gamblers and bookmakers 'wire service' means a horserace wire service and refers to a confederation of operators who supply and service the Nation's bookmakers, usually on a telephonic network, with fast race results and other information on horseraces around the country as an accessory to bookmaking operations."

It is also clear that the transmission of information for use by publishers of newspapers and other periodic publications was not intended by Congress to be subject to the prohibitions of the section in question. In testimony presented to the House Committee in support of the bill, which subsequently became Section 1084, the Attorney General of the United States, Robert F. Kennedy, described the type of activity which it was intended to reach. In his testimony before the House Committee on the Judiciary on May 17, 1961 (hearings before subcommittee #5 Committee on the Judiciary, House of Representatives, 87th Congress, 1st Session, Serial #16, page 24), the Attorney General stated—

"Thus information almost simultaneously transmitted prior to, during and immediately after each race on such items as the starting horses, scratches of entries, probable winners, betting odds, results and the prices paid, is essential to the bookmaker and his clientele in order to insure any sizable gambling."

Subsequently, in response to a question, he stated (page 37)—

"As I said in my statement, the great problem for those involved in this business is instantaneous information. They cannot rely on the fact that this information is going to appear in time in the Washington Post. They are going to, and have to set up other facilities in order to obtain information.

"If we have the enactment of this law, this will seriously curtail their activities."

In the reports of the Senate and House Judiciary Committees accompanying the respective bills, the purpose of Section 1084(a) is also specified. The report of the Senate Judiciary Committee (Report to Accompany S. 1656, 87th Congress, 1st Session, Senate, Calendar No. 560, Report No. 588) states (page 2)—

"The second amendment changes the language of the bill, as introduced (which prohibited the leasing, furnishing, or maintaining of wire communication facility with intent that it be used for the transmission in interstate or foreign commerce of bets or wagers), to prohibit the use of wire communication facility by persons engaged in the business of betting or wagering, in the belief that the individual user, engaged in the business of betting or wagering, is the person at whom the proposed legislation should be directed; * *."

Similarly, the report of the House Committee on the Judiciary (Report to Accompany S. 1656, 87th Congress, 1st Session, House of Representatives, Report No. 967) states (page 2), U.S.Code Cong. and Adm.News 1961, p. 2631—

"Testimony before your Committee on the Judiciary revealed that modern bookmaking depends in large measure on the rapid transmission of gambling information by wire communications facilities. For example, at present the immediate receipt of information as to results of a horserace permits a bettor to place a wager on a successive race. Likewise, bookmakers are dependent upon telephone service for the placing of bets and for layoff betting

on all sporting events. The availability of wire communication facilities affords opportunity for the making of bets or wagers and the exchange of related information almost to the very minute that a particular sporting event begins."

In the light of all the foregoing, it is the Court's opinion that the activities of plaintiffs were not intended by the Congress to be and are not within the scope of Section 1084(a), Title 18 U.S.C.

■ Plaintiffs further contend that even if it should be determined that their transmission of information is within the scope of Section 1084(a), they are excluded therefrom by the provisions of Section 1084(b), which provides—

"Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests * * *."

In support of this contention, plaintiffs urge that their publications are legitimate periodicals published and sold openly and that Congress intended to exclude them together with the legitimate news reporting wire services and newspapers.

The question of what constitutes "information for use in news reporting of sporting events or contests" depends again on the normal and ordinary usage of the terms in question. The record is clear that information similar or in some instances virtually identical to that carried in plaintiffs' publications is regularly reported in newspapers of general circulation. It is a matter of common knowledge that information concerning future sporting events as well as the results of concluded events is normally reported by newspapers of general circulation.

Inasmuch as the government concedes that Section 1084(b) excludes newspapers generally, it is incongruous to contend that Congress intended to prohibit the transmission of identical information for publication in periodicals such as those published by plaintiffs, but to permit it for publication in newspapers of much broader circulation and distribution. Accordingly, the proper interpretation of Section 1084(b) appears to the Court to be that plaintiffs' activities are within the exception of transmission of information for use in news reporting of sporting events or contests.

In summary, it is the Court's opinion that Section 1084(a) prohibits the transmission of gambling information in interstate commerce by persons directly or indirectly engaged in the business of betting or wagering, but that Section 1084, in its present form, does not reach such transmission by or to persons engaged in the publication for sale to the general public through the normal channels of newspaper distribution of periodicals such as those published by plaintiffs which contain information similar or identical to that contained in newspapers of general circulation.

■ A second federal statute which the government alleges the plaintiffs violated is Title 18 U.S.C. § 1953. This contention is based upon the fact that on July 20, 1962, a jury in the United States District Court for the Western District of Kentucky found plaintiffs guilty on four counts of a twelve count indictment and not guilty on the remaining eight counts. There is in the record before this Court a copy of the Indictment in that case, No. 25,778, and the Trial Order entered by the Honorable Henry L. Brooks, United States District Judge, who presided over the jury trial.

The counts numbered 2, 3, 4 and 5, on which plaintiffs (there defendants) were found guilty, alleged briefly as follows:

Counts 2 and 3 charge that the plaintiffs violated Title 18 U.S.C. § 1953 and Title 18 U.S.C. § 2, in that, on two separate occasions, they sent by motor express from Chicago to Louisville certain skids of paper to be used in the production of the Louisville Daily Sports News.

Counts 4 and 5 charge a violation of the same sections in that, on two oc-

casions, plaintiffs sent copies of the overnight edition of the Illinois Sports News from Chicago to Louisville for use in the production of the Louisville Daily Sports News.

Title 18 U.S.C. § 1953 reads as follows:

"(a) Whoever, except a common carrier in the usual course of his business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined not more than $10,000 or imprisoned for not more than five years or both."

"(b) This section shall not apply to (1) parimutuel betting equipment, parimutuel tickets where legally acquired, or parimutuel materials used or designed for use at racetracks or other sporting events in connection with which betting is legal under applicable State law, or (2) the transportation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statutes of that State, or (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication."

"(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of any State, Commonwealth of Puerto Rico, territory, possession, or the District of Columbia."

Section 2 of that Title merely provides that one who aids, abets, counsels, commands, induces, procures or causes an illegal act to be done is a principal and is punishable as such.

The counts on which defendants there were found not guilty included seven (six through twelve) in which they were charged with violating the same sections, 1953 and 2 of Title 18, by sending the finished publication, the Louisville Daily Sports News, from Louisville, Kentucky, to Jeffersonville, Indiana, on seven different dates. The remaining count on which they were found not guilty was count 1 charging a conspiracy to violate Section 1953.

This Court has before it, as the government has correctly pointed out (Reply Memorandum, P. 2), none of the evidence presented to the jury in the Louisville case. Accordingly, it has no basis for determining on what facts the jury reached its verdict. Nor will it speculate thereon, although both the government and the plaintiffs have presented extensive argument based on evidence allegedly introduced in Louisville and urged conclusions predicated thereon.

Similarly, there are not before this Court the instructions of the trial judge. The only information which the Court does have before it is that (1) plaintiffs here were convicted by a jury in the United States District Court in Louisville under Sections 1953 and 2 of Title 18 on counts charging them with sending from Chicago to Louisville skids of paper and copies of the overnight edition of the Illinois Sports News for use in publishing the Louisville Daily Sports News, and (2) plaintiffs were acquitted on all other counts.

It should be noted that none of the counts charged, nor were plaintiffs convicted of, any illegal use of telephone or telegraph facilities. The government urges, however, that a necessary inference from the convictions is that the Louisville Daily Sports News is "paraphernalia * * * used * * * or designed for use in * * * bookmaking," and since it is stipulated in the instant case that plaintiffs used the telephone and telegraph to transmit information from Chicago to Louisville for use in its publication, it follows that such facilities were used to transmit gambling information.

The only difficulty with the government's contention is that on the basis of the bare record of the Louisville proceedings before this Court, the exact opposite inference seems at least equally logical. On seven counts charging that sending the finished publication, the Louisville Daily Sports News, from Louisville to Jeffersonville, Indiana, constituted the interstate shipment of bookmaking paraphernalia, the jury returned not guilty verdicts. Since there was apparently no dispute that the shipments were in fact made on the dates charged, it is arguable that the jury must have concluded that the finished product was not gambling paraphernalia.

In short, the simple fact of the matter is that no conclusion can be drawn with any assurance on the basis of the Indictment and Judge Brooks' Trial Order on the sole question before this Court, i. e., whether telephone or telegraph facilities were used by plaintiffs for the purpose, in the language of Section 1084(d), "of transmitting or receiving gambling information in interstate or foreign commerce in violation of Federal, State or local law."

In connection with all of the foregoing, however, it should be noted that the question of the proper inferences to be drawn from the Louisville jury's verdict is, in the last analysis, academic in view of the conclusion previously reached herein that plaintiffs' publications are within the exception of Section 1084(b). That section excludes from the provisions of Section 1084(d) transmission of "information for use in news reporting of sporting events or contests."

It should further be noted that Section 1953 contains similar although not identical language excepting from its prohibitions "any newspaper or similar publication." Again, it can be urged that the jury's verdict of guilty with respect to the shipment of skids of paper and copies of the overnight edition of the Illinois Sports News for use in printing the Louisville Daily Sports News compels the conclusion that the jury found the latter not within the exception. And

again, the fact of the not guilty verdicts with respect to the interstate shipments of the finished publication is consistent with exactly the opposite inference.

Happily, in the Court's view of the case, the battle of inferences need not be waged, interesting though it might be. While, in my opinion, the government has failed to meet the burden of proof on this issue, the question is fully resolved, as already indicated, by the conclusion that whatever the jury in Louisville decided is academic by virtue of the provisions of Section 1084(b).

■ With respect to the application of Title 18 U.S.C. § 1952 and Title 47 U.S.C. § 501, the former which deals with interstate and foreign travel or transportation in aid of racketeering activities is clearly inapplicable to the facts here present. And the government concedes that the latter section is relevant only in the event that plaintiffs are found to have violated either Section 28-1(a) (10) of the Illinois Criminal Code or Section 1084(a) of Title 18 U.S.C. Since the evidence does not establish that plaintiffs' activities are in violation of either of the foregoing sections, consideration of the applicability of Section 501 becomes unnecessary.

■ Similarly, since it is well established that the constitutionality of an Act of Congress may not be considered unless necessary to decision, the Court need not determine that issue with respect to Section 1084(d) of Title 18. Communist Party, U.S.A. v. Catherwood, 1961, 367 U.S. 389, 392, 81 S.Ct. 1465, 6 L.Ed.2d 919.

It is obvious, of course, that the power of Congress to foreclose publication of periodicals like plaintiffs', or the desirability of so doing, is not here decided. What is decided is that Congress has not yet purported to do so or to authorize the executive branch of the government to accomplish the same end by ordering withdrawal of essential services. Proscription of long-established, openly conducted businesses may on occasion be necessary or desirable in the public inter-

est and may constitute a proper exercise of governmental authority. The power to determine if and when such action should be taken, however, rests, under the Constitution, with the Congress, not the executive or the judiciary. The legislative process is frequently irksome to those who believe they clearly perceive public problems and means for their solution. Sometimes one of the prices of our democratic process is slow progress. But the courthouse is not a by-pass around the houses of Congress.

The government has failed to establish by a preponderance of the evidence that plaintiffs' activities are within the ambit of Section 1084(d), Title 18 U.S.C. Accordingly, permanent injunctions restraining defendants Telephone Company and Western Union from withdrawing their services will be entered.